**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION AT JACKSON**

---

**CANDELA CORPORATION and
SYNERON, INC.,**

     **Plaintiffs,**

     **V.**                        **Case No. _____**

**INMODE MD, LTD.** *d/b/a*
**INMODE AESTHETIC SOLUTIONS,**

     **Defendant.**

---

**COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES**

---

### NATURE OF THE ACTION, PARTIES, JURISDICTION, AND VENUE

1.     On This is an action for injunctive relief and damages due to the actions of Defendant InMode MD, Ltd. ("InMode"), a direct competitor of Plaintiffs, for interference with Plaintiffs' employment relationships and employment contracts with its now-former employees Erik Dowell ("Dowell"), Adrian Bishop ("Bishop"), Aaron Ingold ("Ingold"), Jake Alexander ("Alexander") and Sammy Tantawy ("Tantawy"); inducement of those former employees to breach the non-competition, non-solicitation, and/or non-disclosure provisions in their employment contracts with Plaintiffs; and tortious interference with Plaintiffs' business, for the purpose of harming Plaintiffs' business and wrongfully obtaining an unfair competitive advantage in the marketplace. On March 22, 2017, Plaintiffs filed litigation against Dowell, Bishop and Ingold in Massachusetts seeking injunctive relief and damages for the breach of their employment agreements, violation of the federal Defend Trade Secrets Act and breach of fiduciary

duty.  Their employment agreements contain exclusive Massachusetts venue provisions and, thus, cannot be joined in this action in this Court.

2.      Plaintiff Candela Corporation ("Candela) is a Delaware corporation and maintains its corporate headquarters and principle place of business in Wayland, Massachusetts.

3.      Plaintiff Syneron, Inc. ("Syneron") is a Delaware corporation and maintains its corporate headquarters and principle place of business in California.

4.      Candela and Syneron are part of a group of related entities that jointly market and sell medical devices and products under the Syneron-Candela brand.  For ease of reference, Plaintiffs hereafter will be referred to as "Syneron-Candela."

5.      InMode is an Israeli entity with a principle place of business at Tabor Building, Shaar Yokneam, Yokneam 20692, Israel.

6.      InMode has a United States office at 192 Technology Unit A&B, Irvine, California 92618.

7.      This Court has subject matter jurisdiction under 28 U.S.C. § 1332 as the amount in controversy exceeds the sum or value of $75,000 and the plaintiffs and the defendant are citizens of different states.

8.      InMode's actions in interfering with Syneron-Candela's business and its employment relationships with its employees in West Tennessee (including in Chester County), interference with Syneron-Candela's employment contracts with its employees in Tennessee (including in Chester County), and inducement of Syneron-Candela's former employees in Tennessee (including in Chester County) to breach their

employment contracts has caused, and continues to cause, harm to Syneron-Candela in Tennessee.

9.      Personal jurisdiction over InMode and venue, therefore, is proper in this Court.

## SYNERON-CANDELA'S BUSINESS

10.      Syneron-Candela is a leading global aesthetic device company with a comprehensive portfolio and a global distribution footprint. Its technology enables physicians to provide advanced solutions for a broad range of medical-aesthetic applications using radio frequency and light laser technology, including body contouring, cellulite/fat reduction, hair removal, tattoo removal, wrinkle reduction, improving skin appearance through the treatment of superficial benign vascular and pigmented lesions, and the treatment of acne, leg veins, and cellulite.

11.      Syneron-Candela markets, services, and supports products in 86 countries and has offices in North America, France, Germany, Italy, Portugal, Spain, UK, Australia, China, Japan, and Hong Kong and distributors worldwide.

12.      Syneron-Candela's products, described above, are graded by the FDA and regulated under various state laws as medical devices that can be operated and used only by, or under the supervision of, a licensed medical doctor. Accordingly, Syneron-Candela's customers are principally physicians, physician practice groups, and Med Spas that employ a physician medical director.

13.      Syneron-Candela is involved in an extremely competitive industry in which confidentiality and customer goodwill are valuable assets.

## INMODE's BUSINESS

3

14.     InMode directly competes with Syneron-Candela.

15.     InMode manufactures, markets, and sells medical devices that use radio frequency and light laser technology for skin treatment and contraction, skin tightening, hair removal, skin pigmentation and vascular lesions, cellulite/fat reduction, and body contouring.

## DOWELL'S EMPLOYMENT
## AND AGREEEMENT WITH SYNERON-CANDELA

16.     Syneron-Candela employed Dowell in a number of positions, including Regional Sales Director, Vice-President of North America, and Vice-President of the EMEA Region. In July 2013, Syneron-Candela promoted Dowell to President of the Americas (which included North America and South America).

17.     As President of the Americas, Dowell had knowledge of Syneron-Candela's top performing sales people and their margins, efforts, and skills not generally known in the industry or to the public.  He was responsible for managing the regional directors who in turn managed territory managers. Therefore, he had knowledge of Syneron-Candela's contractual relationships with its sales people and the terms and basis of compensation of its sales people not generally known in the industry or to the public. Dowell also had the opportunity to cultivate relationships with the regional directors, such as Bishop, through frequent communications to collaborate on sales in Bishop's region.

18.     Furthermore, Dowell attended quarterly business reviews for the Aesthetics Division at which Syneron-Candela's business leaders discussed operational and marketing strategies to launch new products, address any service or inventory issues, and leverage Syneron-Candela's products against its competitors.  During these business

reviews, regional directors nationwide gave presentations regarding their region, identifying the top performers on their team or new territory managers in whom they saw great potential.

19.      During the November 2016 quarterly business review, the participants went through Syneron-Candela's organizational chart for the benefit of Syneron-Candela's new president, including identifying how long employees had worked for Syneron-Candela and who the top performers were.  Higher level managers, which did not include regional directors or territory managers, also discussed Syneron-Candela's operational plan for the last quarter of 2016 and for fiscal year 2017.  This information was particularly confidential and not to be shared or disseminated outside the meeting.

20.      Nonetheless, upon information and belief, approximately two weeks prior to his resignation, Dowell breached his confidentiality obligations and shared Syneron-Candela's operational plans for 2017 with regional directors he supervised.  For example, one change in Syneron-Candela's business plan was to merge its three divisions: Aesthetics, Body and Profound.  As a result, in addition to selling aesthetic products, regional directors and territory managers who were previously assigned to the Aesthetic Division would now be selling all of Syneron-Candela's products, including Body and Profound.  Upon information and belief, Dowell instructed regional directors he supervised that they should not sell body products because it would ruin their careers.

21.      In connection with his promotion to, and employment as, President of the Americas, Dowell executed an Employment Agreement dated July 16, 2013. (Ex. 1 – "Dowell Employment Agreement"). In that agreement, Dowell's obligations ran to the "Group," defined as "[Syneron, Inc.], its parent and any of the parent's subsidiaries and

affiliated entities … including without limitation, Syneron Medical Ltd. and Candela Corporation." (Ex. 1, §1.)

22.     In that agreement, Dowell agreed:

following termination of employment with the Company, for any reason, [he] will not, directly or indirectly, either for himself … of for any other person, firm, company or entity, use of disclose any trade secret or Proprietary Information about the Company and/or the Group in order to … (2) solicit, induce or influence any employee, contractor or agent of the Company and/or the Group to terminate his/her or its employment or retention with the Company and/or the Group. (Ex. 1, §5(h).)

23.     The Dowell Employment Agreement defined, "Proprietary Information" as including "the Group's list of past, existing and potential … employees;" "the existence and terms of the Group's contractual relationships;" "information regarding the skills, terms and basis of the compensation of employees … of the Group, "the Group's business operations…and business plans, including but not limited to marketing…research and product and service development plans" and "the Group's pricing information, pricing methods and financial information," (Ex. 1, §5(b).)

24.     Importantly, "Proprietary Information is of critical importance to the Company and a violation of any provision of this Section would seriously and irreparably injure and damage the Company's business." (Ex. 1, §5(e).)

25.     Dowell further agreed that violation of the above non-solicitation provision would result in irreparable injury to Syneron-Candela. (Ex. 1, §8.)

26.     The restrictions set forth in Dowell's Employment Agreement were "fair and reasonably required for the protection of the interests of the Company and the Group." (Ex. 1, §5(i).)

**BISHOP'S EMPLOYMENT
AND AGREEMENT WITH SYNERON-CANDELA**

27.     Bishop accepted employment with Syneron-Candela as a Territory Sales Manager on October 23, 2013.  (Ex. 2 – Bishop Offer Letter.)  As an employee of Syneron-Candela, Bishop worked out of his home office in Arlington, Tennessee, and his territory included parts of Tennessee and Alabama.

28.     Notwithstanding Bishop's "assigned" territory, Med Spa customers on whom he called and to whom he provided products and services on behalf of Syneron-Candela were "national" customers of Bishop, wherever located.

29.     As a Territory Sales Manager, Bishop had direct contact with Syneron-Candela's customers and potential customers and developed personal relationships with those customers on the basis of Syneron-Candela's goodwill and reputation, such that he was the face of Syneron-Candela to those customers.  Bishop also acquired knowledge of Syneron-Candela's confidential and proprietary information, including pricing, quotes, proposals, and discounts to those customers, as well as those customers' purchasing habits, needs, and requirements. Many customers chose to lease Syneron-Candela's devices.  Therefore, some of the most important information Bishop acquired about Syneron-Candela's customers is the name and contact information of the customer, the type of device(s) the customer uses, and when the lease(s) expire on those devices.  With that information, Bishop, and any competitor with whom he may become employed, has a short-cut for business development.  When the lease expiration date approaches, Bishop can call the customer and remind them that it is time to get a new device or upgrade to a more advanced device. This specific information is not public knowledge or commonly known within the industry.

30.     Many of Syneron-Candela's customers are repeat customers.  Regional directors and Territory Sales Managers cultivate their customer relationships so the customer will continue to purchase Syneron-Candela products as new models are introduced or add additional products to their offices.  Customers can also purchase new equipment before their lease expires and roll their financing from their current equipment into financing for the new equipment.  Syneron-Candela's customers are also valuable referrals or influencers to encourage other physicians and Med Spas in their areas to purchase Syneron-Candela products.

31.     On November 5, 2013, in connection with his initial employment by Syneron-Candela, Bishop signed an Assignment of Developments, Non-Disclosure, Non-Competition, and Non-Solicitation Agreement. (Ex. 3 - "Bishop's Employment Agreement".)

32.     To protect Syneron-Candela's legitimate business interests, Bishop agreed that several restrictive covenants would govern his conduct and post-employment conduct.

33.     Bishop agreed that:

while in the employ of the Company and for one [1] year thereafter (the "Restriction Term"), regardless of the reasons for [his] termination, … [he] will not directly or indirectly … (a) accept employment with a company that competes with the Company in the cosmetic and aesthetic /medical laser and light based system market, or engage in competitive activities related thereto.
                    ***
Competition / competitive" includes "performing any duties substantially similar or the same to those which I performed for the Company for myself or for any person or business which competes with the Company's business, which is described as developing, manufacturing, selling, and servicing of aesthetic/cosmetic and medical based laser and light based systems. (Ex. 3, Article V.)

34.    Bishop agreed that:

during the Restriction Term, regardless of the reasons for [his] termination from employment, … [he] will not directly or indirectly … solicit, provide services or products to, or attempt to solicit or provide services or products to, the customers and potential customers of the Company with whom [he] had contact during the course of [his] employment or about whom [he] obtained confidential information during the course of [his] employment with the Company.  (Ex. 3, Article VI.)

35.    Bishop agreed that:

during the Restriction Term, regardless of the reasons for [his] termination, … [he] will not directly or indirectly, alone or as a consultant, partner, officer, director, employee, joint venture, lender or stockholder of any entity, recruit, solicit for hire, hire or knowingly and with my involvement permit any company or business organization in which [he is] employed or which is directly or indirectly controlled by [him] to recruit, solicit for hire or hire any Company employee, agent, representative, or consultant, or any such person who has terminated his/her relationship with the Company within six months of [Bishop's] departure from the Company.  (Ex. 3, Article VII.)

36.    Bishop agreed that Syneron-Candela's Confidential Information includes:

trade secrets, proprietary or confidential information respecting existing and future products and services, designs, methods, formulas, drafts or publications, research, know-how, techniques, systems, databases, processes, software programs or code, developments or experimental work, works of authorship, customer lists and/or customer information, business plans, marketing plans, financial information, sales techniques, projects, the Company's salary and/or pay rates, other Company personnel information, and all other plans and proposals. (Ex. 3, §1.2.)

37.    Syneron-Candela's competitive position in the line of business in which it is engaged depends in part upon its ability to safeguard Confidential Information and goodwill that it has developed with its customers (Ex. 3, Recital D), it would not have provided Bishop with, or given him access to, its Confidential Information without his agreement to these restrictions (*Id*., Recitals C, E-F; Article V), and violation of Bishop's

non-competition provisions would lead to the inevitable disclosure of Syneron-Candela's valuable and sensitive Confidential Information. (*Id.*)

38.    Bishop further agreed, whether during or after his employment:

not to "divulge or disclose to any person or entity outside of the Company, whether by private communications or by public address or publication, or otherwise, any Confidential Information, except to the extent that such disclosure is necessary to perform [his] duties and responsibilities as an employee of the Company"   …..and to "keep confidential all matters entrusted to [him] and … not use or attempt to use any Confidential Information, including confidential information related to third parties which the Company is obligated to maintain as confidential, … nor… use any Confidential Information in any manner which may injure or cause loss or may be calculated to injure or cause loss to the Company, whether directly or indirectly.  (Ex. 3, §§ 4.1, 4.2).

39.    Bishop further agreed that all property of the company remained company property, after the separation of his employment he would not allow others to use company property, and immediately upon separation of employment he would deliver all company property to Syneron-Candela.  (Ex. 3, §8.1.)

40.    Finally, Bishop agreed that his breach of his agreement would cause irreparable harm to Syneron-Candela.  (Ex. 3, §11.6.)

41.    Effective January 6, 2014, Syneron-Candela promoted Bishop to South East Region Sales Director, Aesthetics Division.   In this position, Bishop directly supervised 8-10 Territory Sales Managers in Tennessee, Mississippi, Arkansas, Georgia, Kentucky, Alabama, Oklahoma, Florida, North Carolina, South Carolina, and Louisiana. He also had ultimate responsibility for the performance of the field associates who directly reported to Territory Managers in the region. While Bishop had new responsibilities in this position, many of his prior job duties carried over to his new role.

This promotion constituted additional consideration for the covenants set forth in Bishop's Employment Agreement.

42.     As a Region Sales Director, Bishop had knowledge and access to the same types of Confidential Information, except now he had knowledge and access to Confidential Information regarding more customers, over a larger territory, and with respect to more subordinate employees.

43.     For example, like Dowell, Bishop attended the quarterly business reviews for the Aesthetics Division which discussed operational and marketing strategies to launch new products, address any service or inventory issues, and leverage Syneron-Candela's products against its competitors.  If Syneron-Candela was planning a new product launch, the regional directors received a preview from a research and development employee, including product specifications, as well as information from a marketing employee regarding Syneron-Candela's pricing and strategy behind the launch.

44.     Bishop was also one of the regional directors who gave presentations at the quarterly business reviews regarding his region, identifying the top performers on his team or new territory managers in whom he saw great potential.  Bishop also attended the presentations by the other regional managers in the Aesthetics Division who provided this confidential information for their respective regions. Each regional director also presented on the sales for the past quarter and the average selling price in that region.

45.     In addition to the quarterly division meetings, Bishop participated in monthly aesthetic group meetings which provided more in depth information, including sales for the month, their pipeline, and challenges they were facing.

46.     The Territory Sales Managers Bishop supervised provided him information and access to Confidential Information about Syneron-Candela's customers in weekly and monthly reports, one-on-one meetings, and group calls and meetings. Additionally, the Territory Sales Managers constantly reported in to Bishop on sales calls and events and the status of prospective and pending sales.

47.     Indeed, direct customer interaction continued to be an important part of Bishop's job duties for Syneron-Candela.  Regional directors are expected to continue interacting with customers in person or via telephone or email.  For example, to maximize sales in their regions, regional directors go on "ride-alongs" with their Territory Sales Managers, calling on customers, assisting with any customer complaints and helping pitch the customers new products.  Additionally, to help promote its products, Syneron-Candela held workshops for its prospective and current customers throughout the year. Both Territory Sales Managers and regional directors closed deals with customers at these workshops. In the fall of 2016, Bishop closed multiple deals with customers at a workshop in Beverly Hills, California.

48.     Additionally, as a Region Sales Director, Bishop had access to Syneron-Candela's Confidential Information about its business and customers across his region through access to the company's centralized password protected computer database SalesForce. In SalesForce, Bishop could see what sales had closed in his region, what was in the pipeline, what equipment a customer had, and any customer issues.  Bishop also had access to Syneron-Candela's commission software, Exactly, which showed what each Territory Sales Manager was paid, for which deals they received commissions, and their commission rates.

49.     As South East Region Sales Director, Bishop supervised, among others, Territory Sales Manager Ingold, who worked for Syneron-Candela, in Henderson, Tennessee, and whose territory covered Memphis, Tennessee, Arkansas, Mississippi, and Oklahoma, and Field Sales Lead Generator Alexander, who covered the same territory.

50.     Bishop was one of Syneron-Candela's top performing sales people.  He was awarded Region of the Year, Sales Director of the Year, and President's Club for 2016.  He also received several sales awards the prior year.  His region "team," which included Ingram and Alexander, was the company's highest producing team in the country.

51.     In January 2017, Bishop attended the company's national sales meeting, at which the company trained all sales staff on the company's complete line of products and discussed its business plans and strategies for the coming year.

52.     During a one-on-one meeting with Jeff Nardoci ("Nardoci"), Syneron-Candela's Chief Commercial Officer, Nardoci discussed with Bishop the competitors and issues in his region and what Syneron-Candela had lined up to address those issues.  This highly confidential information was not shared with sales employees below the Regional Director level.  Nardoci also shared with Bishop the entire product pipeline and Syneron-Candela's business and marketing strategy for the next year.

### INGOLD'S EMPLOYMENT
### AND AGREEMENT WITH SYNERON-CANDELA

53.     Syneron-Candela employed Ingold as a Territory Sales Manager on or about February 18, 2013.  Ingold worked for Syneron-Candela from his home office in Henderson, Chester County, Tennessee.

54.     Ingold's territory included Tennessee, Mississippi, Arkansas, Kansas, and Oklahoma. As a Territory Sales Manager, Ingold had access to Syneron-Candela's Confidential Information, as set forth above.

55.     To protect its legitimate business interests, as set out above, Syneron-Candela required Ingold to sign an employment agreement containing the same provisions as Bishop's Employment Agreement. (Ex. 4 – "Ingold's Employment Agreement".)

56.     Effective January 1, 2016, Syneron-Candela promoted Ingold to Sr. Territory Sales Manager.  While this "promotion" resulted in a new title and greater compensation, Ingold's job duties remained essentially the same.

57.     In September 2016, Syneron-Candela hired Alexander as a Field Sales Lead Generator to work under Ingold.  Alexander signed an employment Agreement with post-employment non-competition, non-solicitation and non-disclosure provisions.  (Ex. 5 - "Alexander Employment Agreement".)  Through Alexander's research and field calls on customers and potential customers, Alexander would identify customers and potential customers with an interest in Syneron-Candela's products and give that information to Ingold.  Ingold, therefore, could spend his time calling primarily on customers and potential customers who were more likely to purchase Syneron-Candela's products.

58.     As a Territory Sales Manager, Ingold had direct contact with Syneron-Candela's customers and potential customers and developed personal relationships with those customers on the basis of Candela's goodwill and reputation, such that he was the face of Syneron-Candela to those customers.

14

## TANTAWY'S EMPLOYMENT
## AND AGREEMENT WITH SYNERON-CANDELA

59.     Syneron-Candela employed Tantawy as a Senior Territory Manager on or about February 12, 2015.

60.     Tantawy's territory included California, the Pacific Northwest, the Rocky Mountain states, the Southwest, and Western Canada.     As a Territory Sales Manager, Tantawy had access to Syneron-Candela's Confidential Information, as set forth above.

61.     To protect its legitimate business interests, as set out above, Syneron-Candela required Tantawy to sign an employment agreement containing the same provisions as Bishop's and Ingold's Employment Agreements. (Ex. 6 – "Tantawy's Employment Agreement".)

62.     As a Territory Sales Manager, Tantawy had direct contact with Syneron-Candela's customers and potential customers and developed personal relationships with those customers on the basis of Candela's goodwill and reputation, such that he was the face of Syneron-Candela to those customers.

### INMODE's RAIDING OF SYNERON-CANDELA'S EMPLOYEES

#### Dowell

63.     In 2016, InMode's Global CEO Moshe Mizrahy ("Mizrahy") determined that despite its "progress in North America during the last few years … [InMode] … [had] reached a point where we need to make management and organizational changes" and that its "current management in North America ha[d] reached its managerial limit." (Ex. 7 at 1-2 – 10/7/2016 Email from Mizrahy to Dowell.)

64.     Mizrahy was the former CEO of Syneron.

15

65.     Sometime before September 26, 2016, InMode began recruiting Dowell to leave Syneron-Candela to become InMode's new CEO of the Americas.

66.     Sometime on or around October 1, 2016, Mizrahy met with Dowell in New York to discuss employment of Dowell by InMode. (*Id*. at 2.)  Prior to the meeting, Mizrahy presented InMode's business plan to Dowell, which included strengthening InMode's sales network in North America.  The business plan also identified Syneron-Candela as one of two of InMode's major competitors in the medical aesthetic market in North America.  Finally, the business plan included a proposal to Dowell for a position as President of InMode Americas with full responsibility for marketing, sales and service in North America and South America.

67.     On October 7, 2016, InMode officially offered Dowell the position of CEO of the Americas to include a salary, annual bonuses, and an equity position in the company.  In that position, Dowell would report to Mizrahy and the Board of Directors and would be the second-in-command at the company.  (*Id* at 2.)

68.     Thereafter, following a telephone call with Dowell, Mizrahy, on behalf of InMode, instructed Dowell on October 14, 2016:  "Regarding Management and Team – you will have full authority to replace and change any position holder that you would like to replace."  (*Id*. at 1 – 10/14/2016 Email from Mizrahy to Dowell.)

69.     In Mode was extremely anxious to make those personnel changes.  (*Id*.)

70.     As evidenced by InMode's agreement "to give you full indemnification to cover and represent you in the event that any legal action is taken against you," (*Id*.) InMode employed Dowell with knowledge of his contractual obligations, including his confidentiality and non-solicitation obligations, and with the understanding that, in

performing his duties for InMode and making the desired personnel changes, Dowell might violate his employment agreement with Syneron-Candela, including Dowell's post-termination confidentiality and non-solicitation obligations.

71.     In his positions with Syneron-Candela, Dowell knew that Syneron-Candela entered into employment agreements with its employees, including Bishop, Ingold, Alexander, and Tantawy and knew the terms of those agreements.

72.     Upon information and belief, Dowell thereafter began directly and indirectly soliciting Syneron-Candela's employees, on behalf of InMode, to leave Syneron-Candela and become employed with InMode.

73.     On January 13, 2017, Dowell voluntarily resigned his employment from Syneron-Candela.

74.     On January 25, 2017, InMode issued a press release that it had hired Dowell as its Chief Executive Officer of the Americas.  (Ex. 8 – 1/2/5/2017 Press Release - "InMode/Invasix Names New CEO for North & South America.")

75.     InMode has acknowledged, though its attorneys, that Dowell continues to retain Syneron-Candela's information on his laptop computer, but has refused to identify that information or documents containing Syneron-Candela's information or delete and/or return that information to Syneron-Candela.

76.     Upon information and reasonable belief, Syneron-Candela believes that Dowell has used and disclosed, and continues to use and disclose, Syneron-Candela's Confidential Information on behalf of InMode and for InMode's benefit.

**Bishop**

77.    On January 14, 2017, the day immediately after Dowell's resignation, Bishop told Joel Schwartz, Syneron-Candela's HR Director for North America, during the company's national sales meeting that he (Bishop) had an offer from another company and was attending the meeting only for the purpose of deciding if he wanted to stay.

78.    The following day, January 15, 2017, Bishop made the same or similar statements to the company's CEO for North America.

79.    Thereafter, Bishop refused to participate in further events or to accept or be recognized for his awards at the national sales meeting. Bishop walked out and returned to Tennessee before the national sales meeting concluded.

80.    In light of his prior statements, Syneron-Candela understood and considered Bishop's conduct to constitute his resignation.

81.    Under Syneron-Candela's commission plan, upon termination of employment, employees are eligible for commissions on closed deals that have been shipped and received by the customer and revenues collected. Employees can receive commissions for any deals made prior to their separation date if the revenue is collected within thirty days of their separation.

82.    Syneron-Candela agreed to make Bishop's last day of employment February 10, 2017, to extend the time for him to receive commissions on deals that had closed but had not yet been shipped or received by the customer and revenue collected. During this time, from January 15 through February 10, 2017, Bishop also continued receiving a salary from Syneron-Candela.

83.     While still in Syneron-Candela's employ, Bishop began assisting InMode, his soon-to-be employer and a direct competitor, with their internal compensation and training issues.

84.     For example, on January 31, 2017, Dowell, as CEO of Americas for InMode, sent an email to Yang Phan at InMode, Bishop, and others to "introduce" Phan to "the dream team" for the purpose of providing Bishop, while he was still employed with Syneron-Candela, and others sales materials and presentations on InMode's products and technologies. Dowell sent this email to Bishop at his Candela email address. (Ex. 9 – 1/31/2017 email from Dowell to Phan, Lakhani, Bishop, and Lembke.)

85.     As another example, on February 3, 2017, Dowell copied Bishop on an email, while Bishop was still employed with Syneron-Candela, informing Bishop and others that Mizrahy had approved salary increases for certain InMode employees. Dowell sent this email to Bishop at his Candela email address. (See Ex. 10 – 2/3/2017 Email from Dowell to Mitchell, Bishop and Lakhani.)

86.     Based upon the above, Syneron-Candela believes that Dowell, on behalf of InMode, solicited and induced Bishop to become employed with InMode and that Bishop was working for InMode, a direct competitor, while still employed by Syneron-Candela, and used Syneron-Candela's resources to do so.

87.     Bishop's last day of employment with Syneron-Candela was February 10, 2017.

88.     On February 14, 2017, InMode issued a press release that it had appointed Bishop as its Vice President of Sales for the East Region.  (Ex. 11 – 2/14//2017 Press Release-"InMode Aesthetics Strengthens Sales Force in North America".)

89.     As Vice-President of Sales for the East Region, Bishop's InMode territory covers substantially the same potential customer base and includes many of the same customers as his former Syneron-Candela region.

90.     This situation, as Bishop acknowledged in his Employment Agreement, will lead to the inevitable use and disclosure of Syneron-Candela's Confidential Information, and likely already has.

91.     Knowledge of Syneron-Candela's Confidential Information about Syneron-Candela's national business and marketing strategies and its customers in his region for InMode places Bishop at an unfair competitive advantage against Syneron-Candela. Through the customer relationships he developed through Syneron-Candela's reputation and goodwill during his employment, and knowledge of customers' lease expiration dates, purchase history, pricing, any complaints or issues and other Confidential Information, Bishop will be able call upon, service, and sell to those customers without having to put in the time, effort, research, and work otherwise required to develop those customers and acquire their business – in effect giving him unfair leg up in competing against Syneron-Candela.

92.     Syneron-Candela issued Bishop a laptop computer to use in his employment.  That laptop computer has remained, at all times, the property of Syneron-Candela. That laptop computer contains Syneron-Candela's proprietary and Confidential Information.  Upon his separation from employment, Bishop failed and refused to return that laptop computer to Syneron-Candela.

93.     InMode has acknowledged, though its attorneys, that Bishop continues to retain Syneron-Candela's laptop computer and the proprietary and Confidential Information contained thereon, but has refused to return Syneron-Candela's property.

94.     Upon information and reasonable belief, Syneron-Candela believes that Bishop has used and disclosed, and may be continuing to use and disclose, Syneron-Candela's Confidential Information in his employment with and for the benefit of InMode.

95.     In his positions with Syneron-Candela, Bishop knew that Syneron-Candela entered into employment agreements with its employees, including Ingold, Alexander, and Tantawy and knew the terms of those agreements.

### Ingold and Alexander

96.     On February 17, 2017, just over one month after Dowell resigned and less than one week after Bishop's last day, Ingold voluntarily resigned his employment with Syneron-Candela.

97.     On February 10, 2017, approximately one month after Dowell's resignation and on Bishop's last day, Alexander, who directly assisted Ingold's sales efforts, voluntarily resigned his employment with Syneron-Candela.

98.     Shortly after their resignations, Ingold and Alexander became employed with InMode in positions similar to those they held with Syneron-Candela.

99.     The information Ingold and Alexander  had access to and acquired upon their access to Syneron-Candela's Confidential Information and customer contact as the result of their employment with Syneron-Candela, allows them an unfair competitive advantage with Syneron-Candela, as they can call upon or direct others to call upon

physicians and other businesses whom they know are already interested in purchasing products offered in the industry without having to put in the effort and research otherwise required to obtain this information. Further, knowledge of Syneron-Candela's customers, such as their pricing history, service history and the lease expiration dates on their Syneron-Candela devices gives them an unfair competitive advantage in the market, as set forth above.

100.    Based upon this information, Candela believes, and it is reasonable to believe, that Dowell and/or Bishop, acting on behalf of InMode, solicited Ingold and Alexander to leave Syneron-Candela and become employed with InMode, to harm and disrupt Syneron-Candela's business, and continue to solicit other current employees of Candela.

### Tantawy

101.    On March 24, 2017, Tantawy resigned from Syneron-Candela.

102.    On March 24, 2017, counsel for Candela sent correspondence to Moshe Mizrahy, CEO of InMode, notifying InMode of the Massachusetts litigation to enforce Candela's employment agreements.  (Ex. 12 – "Cease and Desist Letter to InMode").  In the correspondence, Candela's counsel also informed InMode that Dowell and Bishop had retained Candela's proprietary information and breached their fiduciary duties to Candela.  Finally, Candela expressed its concern that InMode was continuing to solicit its employees to work at InMode and put InMode on notice that all of its marketing and sales employees, like Tantawy, had employment agreements with Candela prohibiting them from performing substantially the same job duties that they performed on behalf of Candela for InMode.

103.    Shortly after his resignation, Tantawy became employed with InMode in a position similar to the one he held at Syneron-Candela.

104.    The information Tantawy had access to and acquired upon his access to Syneron-Candela's Confidential Information and customer contact during and as the result of his employment with Syneron-Candela, allows him an unfair competitive advantage with Syneron-Candela.  Further, knowledge of Syneron-Candela's customers, such as their pricing history, service history and the lease expiration dates on their Syneron-Candela devices gives him an unfair competitive advantage in the market, as set forth above.

105.    Based upon this information, Syneron-Candela believes, and it is reasonable to believe, Dowell and/or Bishop, acting on behalf of InMode, solicited Tantawy to leave Syneron-Candela and become employed with InMode, a direct competitor, to harm and disrupt Syneron-Candela's business; and continues to solicit other current employees of Syneron-Candela.

### COUNT I – INDUCEMENT TO BREACH CONTRACT

106.    InMode was aware of Dowell's employment agreement and contractual obligations to Syneron-Candela.

107.    InMode, through Dowell, was aware of Bishop's employment agreement and contractual obligations to Syneron-Candela.

108.    InMode, through Dowell and/or Bishop, was aware of Ingold's, Alexander's, and Tantawy's employment agreements with and contractual obligations to Syneron-Candela.

109.     Dowell's, Bishop's, Ingold's, Alexander's, and Tantawy's actions described above violated and continue to violate one or more provisions of their employment agreements with Syneron-Candela, including the non-competition, non-disclosure, and/or non-solicitation provisions in their respective employment agreements.

110.     InMode, wrongfully and without justification, induced Dowell, Bishop, Ingold, Alexander, and Tantawy to breach the non-solicitation, non-competition, and/or confidentiality provisions of their employment agreements with Syneron-Candela.

111.     InMode, wrongfully and without justification, induced Dowell and Bishop to breach their contractual obligations to return Syneron-Candela's property upon the separation of their employments with Syneron-Candela.

112.     InMode continues to employ Bishop, Ingold, Alexander, and Tantawy with knowledge that their employment with InMode violates the terms of their employment agreements with Syneron-Candela.

113.     InMode's actions have damaged Syneron-Candela and its goodwill and caused, and continue to cause, harm to Syneron-Candela for which an adequate remedy at law does not exist.

**COUNT II – INTERFERENCE WITH EMPLOYMENT RELATIONSHIPS**

114.     InMode was aware of Syneron-Candela's employment relationships with Bishop, Ingold, Alexander, and Tantawy.

115.     InMode, wrongfully and without justification, interfered with Syneron-Candela's employment relationships with Bishop, Ingold, Alexander, and Tantawy.

116.    InMode's actions have damaged Syneron-Candela and its goodwill and caused, and continue to cause, harm to Syneron-Candela for which an adequate remedy at law does not exist.

### COUNT III - TORTIOUS INTERFERENCE WITH BUSINESS

117.    InMode was aware of Bishop's employment and position with Syneron-Candela.

118.    Bishop owed Syneron-Candela a duty of loyalty during his employment with Syneron-Candela to act only for its benefit and not to its detriment.

119.    Bishop's actions described above in working for and/or assisting a direct competitor during his employment with Syneron-Candela breached his duty of loyalty.

120.    InMode induced Bishop to breach his duty of loyalty and, therefore, tortiously interfered with Syneron-Candela's business.

121.    InMode's actions described above in inducing Dowell, Bishop, Ingold, Alexander, and Tantawy to breach their respective employment agreements, without justification, tortiously interfered with Syneron-Candela's business.

122.    InMode's actions have damaged Syneron-Candela and its goodwill and caused, and continue to cause, harm to Syneron-Candela for which an adequate remedy at law does not exist.

### COUNT IV - VIOLATION OF TENNESSEE UNIFORM TRADE SECRETS ACT

123.    The customer, sales, pricing, marketing, business plans, and financial data of Syneron-Candela described above, and the compilation of that information ("Trade Secrets"), is not generally known to and not readily ascertainable by proper means by other persons who can obtain economic value from its disclosure and use.

124.    Syneron-Candela derives independent economic value from its Trade Secrets not being generally known to or readily ascertainable by others.

125.    Being in an extremely competitive industry, Syneron-Candela's competitors, including InMode, can derive economic value from the disclosure and use of Syneron-Candela's Trade Secrets.

126.    Syneron-Candela's Trade Secrets are the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

127.    Syneron-Candela's Trade Secrets constitutes trade secrets under the Tennessee Uniform Trade Secrets Act, Tenn. Code Ann. § 47-25-1701, *et seq*. ("TUTSA").

128.    InMode, through the actions and continued actions of Bishop – its Vice-President – misappropriated Syneron-Candela's Trade Secrets within the meaning of Tenn. Code Ann. § 47-25-1702(3), which defines "misappropriation" as:

**(A)** Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

**(B)** Disclosure or use of a trade secret of another without express or implied consent by a person who:

**(i)** Used improper means to acquire knowledge of the trade secret; or

**(ii)** At the time of disclosure or use, knew or had reason to know that that person's knowledge of the trade secret was:

**(a)** Derived from or through a person who had utilized improper means to acquire it;

**(b)** Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or

**(c)** Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or

26

**(iii)** Before a material change of the person's position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

129.    InMode, through the actions and continued actions of Bishop – its Vice-President – acquired, misappropriated, and continues to possess Syneron-Candela's Trade Secrets through improper means within the meaning of Tenn. Coe Ann. § 47-25-1702(2), which defines "improper means" to "include[] theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy or limit use, or espionage through electronic or other means."  Tenn. Code Ann. § 47-25-1702(1).

130.    InMode's possession of and refusal to return, as well as its use and/or threatened use, disclosure, and misappropriation of Syneron-Candela's Trade Secrets has caused, and continues to cause, harm to Syneron-Candela for which injunctive relief may be issued under TUTSA, Tenn. Code Ann. § 47-25-1703.

131.    Syneron-Candela has also incurred actual damages as the result of InMode's possession of and refusal to return, as well as its use and/or threatened use, disclosure, and misappropriation of Syneron-Candela's Trade Secrets.

132.    InMode's possession of and refusal to return, as well as its use and/or threatened use, disclosure, and misappropriation of Syneron-Candela's Trade Secrets was and has been willful and malicious, entitling Syneron-Candela to an award of exemplary damages, pursuant to TUTSA, Tenn. Code Ann.  § 47-25-1704(b), in an amount not exceeding twice its actual damages, and reasonable attorney's fees pursuant to Tenn. Code Ann. § 47-25-1705(3).

## PRAYER FOR RELIEF

Wherefore, Syneron-Candela prays that this Court:

1.  enter a Preliminary Injunction and a Permanent Injunction enjoining InMode from using, disclosing, and refusing to return Syneron-Candela's proprietary and Confidential Information;

2.  enter a Preliminary Injunction and a Permanent Injunction enjoining InMode from using and refusing to return Syneron-Candela's property;

3.  enter a Preliminary Injunction and a Permanent Injunction enjoining InMode from employing Bishop, Ingold, Alexander, and Tantawy until the expiration of the non-competition provisions in their employment agreements with Syneron-Candela;

4.  enter a Preliminary Injunction and a Permanent Injunction enjoining from inducing current and former Syneron-Candela employees from violating the their employment agreements with Syneron-Candela;

5.  enter Preliminary Injunction and a Permanent Injunction enjoining InMode from interfering with Syneron-Candela's employment contracts and relationships with its employees;

6.  enter Preliminary Injunction and a Permanent Injunction enjoining InMode from interfering with Syneron-Candela's business;

7.  awarding Syneron-Candela its actual and punitive damages, costs, and such further relief to which it is entitled, whether at law or inequity;

8.  awarding Syneron-Candela exemplary damages under TUTSA, Tenn. Code Ann. § 47-25-1704(b); and

9.     awarding Syneron-Candela its reasonable attorney's fees pursuant to Tenn. Code Ann. § 47-25-1705(3).


Respectfully submitted,


s/ Paul E. Prather
Paul E. Prather (10089)
Steven W. Likens (013311)
Littler Mendelson, P.C.
3725 Champion Hills Drive
Suite 3000
Memphis, Tennessee 38125
Phone: (901) 795-6695
pprather@littler.com
slikens@littler.com

Attorneys for
Candela Corporation and Syneron, Inc.